1  Melissa A. Fortunato (SBN 319767)
     fortunato@bespc.com
2  Marion C. Passmore (SBN 228474)
     passmore@bespc.com
3  BRAGAR EAGEL & SQUIRE, P.C.
   580 California Street, Suite 1200,
4  San Francisco, CA 94104
   Telephone: (415) 568-2124
5  Facsimile: (212) 214-0506

6  *Attorney for Plaintiffs*

7

8              **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
9

10  | REONY TONNEYCK, ROBERT | Case No.: |
11  | HANN, and RONALD HINTON, | |
    | derivatively on behalf of | **VERIFIED STOCKHOLDER** |
12  | CHARGEPOINT HOLDINGS, INC., | **DERIVATIVE COMPLAINT** |
13  | Plaintiff, | **JURY TRIAL DEMANDED** |
14  | | |
15  | v. | |
16  | ROXANNE BOWMAN, ELAINE L. | |
17  | CHAO, BRUCE CHIZEN, AXEL | |
    | HARRIES, JEFFREY HARRIS, SUSAN | |
18  | HEYSTEE, REX S. JACKSON, MARK | |
19  | LESCHLY, MICHAEL LINSE, | |
    | PASQUALE ROMANO, EKTA | |
20  | SINGH-BUSHELL, G. RICHARD | |
21  | WAGONER, JR., and RICK WILMER, | |
22  | Defendants, | |
23  | and | |
24  | CHARGEPOINT HOLDINGS, INC., | |
25  | Nominal Defendant. | |
26

27

28

**INTRODUCTION**

Plaintiff's Reony Tonneyck, Robert Hann, and Ronald Hinton ("Plaintiffs"), by and through his/her counsel, derivatively on behalf of Nominal Defendant ChargePoint Holdings, Inc. ("ChargePoint" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by ChargePoint with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by ChargePoint; (iii) securities class actions against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between December 17, 2021 and November 16, 2023 (the "Relevant Period") with respect to ChargePoint's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning ChargePoint.

**NATURE OF THE ACTION**

1. This is a stockholder derivative action asserted on behalf of Nominal Defendant ChargePoint against certain officers and the members of the Company's Board for the claims asserted herein to recover damages caused to the Company.

2. ChargePoint purports to provide networked solutions for charging electric vehicles. The Company generates its revenues from cloud subscription services and charging hardware. The Company touts that its goods and services are designed for all types of transport fleets, commercial and residential, and that its charging hardware can be used anywhere, including home to workplace, parking, hospitality, and retail.

3.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that (1) the Company was experiencing higher component costs and supply overruns for first-generation DC charging products; (2) that, as a result, the Company was likely to incur impairment charges; (3) that, as a result of the foregoing, the Company's profitability would be adversely impacted; and (4) that, as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis

4.     The truth began to emerge on September 6, 2023, after the market closed, when ChargePoint reported its second quarter fiscal year 2024 financial results. The Company reported a "$28.0 million, or 19 percentage point, inventory impairment charge" and second quarter 2024 GAAP gross margins of 1%, down from 17% for the prior year's same quarter. ChargePoint further stated that the Company had also taken an "inventory impairment charge . . . to address legacy supply chain-related costs and supply overruns on a particular DC product."

5.     On this news, the Company's share price dropped $0.77, or 11%, to close at $6.29 per share on September 7, 2023, on unusually heavy trading volume.

6.     The truth fully emerged on November 16, 2023, after the market closed, when ChargePoint released preliminary financial results for its third quarter of 2024. On that day, ChargePoint revealed that the Company had an "additional non-cash inventory impairment charge" of $42 million "related to product transitions and to better align inventory with current demand" and that the Company expected to report "GAAP gross margin of negative 23% to negative 21%." The Company further disclosed that its revenue had fallen to "$108 million to $113 million, as compared to $150 to $165 million as previously expected." Finally, ChargePoint revealed that the

Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") had been replaced, effective immediately.

7.     On this news, the Company's share price fell $1.11, or 35%, to close at $2.02 per share on November 17, 2023, on unusually heavy trading volume.

8.     As a direct and proximate result of the misconduct described herein by Individual Defendants, ChargePoint has sustained significant damages as explained below.

**JURISDICTION AND VENUE**

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint raises a federal question under Sections 10(b) and 21D of the Exchange Act. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.    This Court has jurisdiction over each defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because its principal place of business is located in California and has consented to service in this state.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to ChargePoint. Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant ChargePoint could have sued the same Defendants in this District.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

## **PARTIES**

2      12.    Plaintiffs are ChargePoint stockholders and have continuously held

3   ChargePoint stock from the time of the wrongdoing alleged herein until the present.

4   Plaintiffs will fairly and adequately represent ChargePoint's interest in this action.

5      13.    Nominal Defendant ChargePoint is incorporated under the laws of

6   Delaware, and its principal executive offices are located at 240 East Hacienda Avenue,

7   Campbell, California 95008. ChargePoint's common stock trades on the New York

8   Stock Exchange ("NYSE") under the symbol "CHPT."

9      14.    Defendant Roxanne Bowman ("Bowman") has served as a member of

10   the Board since August 2019. For the Company's fiscal year 2023, Defendant

11   Bowman received $40,000 in earned fees or paid in cash and $162,349 in stock awards

12   for total compensation of $202,349. For the Company's fiscal year 2022, Defendant

13   Bowman received $40,000 in earned fees or paid in cash and $92,057 in stock awards

14   for total compensation of $132,057.

15      15.    Defendant Elaine L. Chao ("Chao") has served as a member of the Board

16   since December 2021. For the Company's fiscal year 2023, Defendant Chao received

17   $40,000 in earned fees or paid in cash and $162,349 in stock awards for total

18   compensation of $202,349. For the Company's fiscal year 2022, Defendant Chao

19   received $10,000 in earned fees or paid in cash and $415,236 in stock awards for total

20   compensation of $425,236.

21      16.    Defendant Bruce Chizen ("Chizen") has served as a member of the Board

22   since December 2014 and was appointed Chairman in 2022. He also has served as a

23   member of the Compensation and Organizational Development Committee

24   ("Compensation") since at least 2021. For the Company's fiscal year 2023, Defendant

25   Chizen received $70,000 in earned fees or paid in cash and $162,349 in stock awards

26   for total compensation of $232,349. For the Company's fiscal year 2022, Defendant

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Chizen received $70,000 in earned fees or paid in cash and $92,057 in stock awards for total compensation of $162,057.

17.     Defendant Axel Harries ("Harries") has been a member of the Board since October 2016. For the Company's fiscal year 2023, Defendant Harries received $40,000 in earned fees or paid in cash and $162,349 in stock awards for total compensation of $202,349.  For the Company's fiscal year 2023, Defendant Harries received $40,000 in earned fees or paid in cash and $162,349 in stock awards for total compensation of $202,349. For the Company's fiscal year 2022, Defendant Harries received $40,000 in earned fees or paid in cash and $619,307 in stock awards for total compensation of $659,307.

18.     Defendant Jeffrey Harris ("Harris") has served as a member of the Board since December 2018 and as Chair of the Audit Committee since at least 2021. For the Company's fiscal year 2023, Defendant Harris received $60,000 in earned fees or paid in cash and $162,349 in stock awards for total compensation of $222,349. For the Company's fiscal year 2022, Defendant Harris received $60,000 in earned fees or paid in cash and $619,307 in stock awards for total compensation of $679,307.

19.     Defendant Susan Heystee ("Heystee") has served as a member of the Board and as a member of the Audit Committee since at least 2021. For the Company's fiscal year 2023, Defendant Heystee received $40,000 in earned fees or paid in cash and $162,349 in stock awards for total compensation of $202,349. For the Company's fiscal year 2022, Defendant Heystee received $30,000 in earned fees or paid in cash and $305,986 in stock awards for total compensation of $335,986.

20.     Defendant Rex S. Jackson ("Jackson") served as CFO from May 2018 to November 16, 2023. For the Company's fiscal years 2023 and 2022, Defendant Jackson received total compensation of over $8.5 million and $13.1 million, respectively.

21.     Defendant Mark Leschly ("Leschly") has served as a member of the Board since December 2009. He has served as a member of the Compensation Committee since at least 2021. For the Company's fiscal year 2023, Defendant Leschly received $48,000 in earned fees or paid in cash and $162,349 in stock awards for total compensation of $210,349. For the Company's fiscal year 2022, Defendant Leschly received $48,000 in earned fees or paid in cash and $560,662 in stock awards for total compensation of $608,662.

22.     Defendant Michael Linse ("Linse") has served as a member of the Board since April 2012 and has served as Chair of the Compensation Committee since at least 2021. For the Company's fiscal year 2023, Defendant Linse received $55,000 in earned fees or paid in cash and $162,349 in stock awards for a total compensation of $217,349. For the Company's fiscal year 2022, Defendant Linse received $55,000 in earned fees or paid in cash and $619,307 in stock awards for a total compensation of $674,307.

23.     Defendant Pasquale Romano ("Romano") served as the Company's President, CEO, and member of the Board from February 2011 to November 16, 2023. For the Company's fiscal years 2023, 2022, and 2021, Defendant Romano received over $16.7 million, $58.6 million, and $859,000 in total compensation.

24.     Defendant Ekta Singh-Bushell ("Singh-Bushell") has served as a member of the Board since April 2022 and as a member of the Audit Committee since 2022. For the Company's fiscal year 2023, Defendant Singh-Bushell received $40,000 in earned fees or paid in cash and $415,052 in stock awards for total compensation of $455,052.

25.     Defendant G. Richard Wagoner, Jr. ("Wagoner") has served as a member of the Board since February 2017 and as a member of the Audit Committee since at least 2021. For the Company's fiscal year 2023, Defendant Wagoner received $40,000 in earned fees or paid in cash and $162,349 in stock awards for a total compensation

of $202,349. For the Company's fiscal year 2022, Defendant Wagoner received $40,000 in earned fees or paid in cash and $560,662 in stock awards for a total compensation of $600,662.

26.     Defendant Rick Wilmer ("Wilmer") has served as President, CEO, and member of the Board since November 16, 2023. He previously served as ChargePoint's Chief Operating Officer from July 2022 until November 16, 2023. For the Company's fiscal year 2023, Defendant Wilmer received almost $8.8 million in compensation.

27.     The following Defendants are hereinafter referred to as the "Individual Defendants": Bowman, Chao, Chizen, Harries, Harris, Heystee, Jackson, Leschly, Linse, Romano, Singh-Bushell, Wagoner, and Wilmer.

28.     The following Individual Defendants are collectively referenced herein as the "Director Defendants": Bowman, Chao, Chizen, Harries, Harris, Heystee, Leschly, Linse, Singh-Bushell, Wagoner, and Wilmer.

29.     The following Individual Defendants are collectively referenced herein as the "Insider Trading Defendants": Chizen, Jackson, Linse, Romano, Singh-Bushell, and Wilmer.

30.     The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Harris, Heystee, and Singh-Bushell.

31.     The following Individual Defendants are collectively referenced herein as the "Compensation Committee Defendants": Chizen, Leschly, and Lisen.

32.     The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants": Jackson and Romano.

33.     The Individual Defendants and Nominal Defendant are collectively referenced in as "Defendants."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY
## DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

34.   At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its Stockholders, the members of the public who had invested in ChargePoint.

35.   Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

36.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

37.   Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and the use and preservation of its property and assets.

38.   Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

39.   To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of ChargePoint were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal

authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintains an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

40.     The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its Stockholders despite their knowledge of the risk of serious injury to the Company.

41.     Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ChargePoint.

42.     The Board has adopted ChargePoint's Code of Conduct to deter wrongdoing, which imposes additional duties and responsibilities on the Individual Defendants. The Code of Conduct provides, in relevant part:

*4. Honest and Ethical Conduct*

The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically.

Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

\*\*\*

*9. Insider Trading*

You are not permitted to use or share confidential information for stock trading purposes or for any other purpose, except the conduct of Company business. All non-public information about the Company should be considered confidential information. To use "material non-public information" about the Company or the market for the Company's securities for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical, but also illegal, and could result in criminal prosecution in addition to the termination of your employment. "Material non-public information" includes information that is not available to the public at large that could affect the market price of the Company's or another company's securities and that a reasonable investor would consider important in deciding whether to buy, sell or hold the securities. In order to assist with compliance with laws against insider trading, the Company has adopted an Insider Trading Policy. A copy of that policy, which has been distributed to every employee, is available on the Company's internal website. If you have any questions, please consult the Company's Chief Financial Officer or designated legal personnel.

\*\*\*

CODE OF ETHICS FOR CEO AND SENIOR FINANCIAL OFFICERS In addition to being bound by all other provisions of this Code of Conduct, the CEO and senior financial officers are subject to the following additional specific policies:

1. The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in any public filings or other public communications made by the Company which contain financial information. Accordingly, it is the responsibility of the CEO and each senior financial officer promptly to bring to the attention of the General Counsel any material information of which he or she may become aware that affects the disclosures made by the Company in any public filing or other public communications which contain financial information.

2. The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

3. The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information he or she may have concerning a material misstatement in any reported financial information of the Company, in particular any material over or understatement of the Company's assets, liabilities, revenues, expenses, and/or cash flows.

4. The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information such officer may have concerning any violation of this Code of Conduct, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

5. The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information such officer may have concerning evidence of a material violation of the securities laws or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

6. The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of this Code of Conduct or of these additional procedures by the CEO and the Company's senior financial officers. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code of Conduct and to these additional procedures, and shall include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, demotion or reassignment of the individual involved, suspension with or without pay or benefits (as determined by the Board) and potential termination of the individual's employment. In determining what action is appropriate in a particular case, the Board or such designee shall take into account all relevant

information, including the nature and severity of the violation, whether the violation occurred once or repeatedly, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

43. The Board has also adopted ChargePoint's Corporate Governance Guidelines ("Governance Guidelines") "to provide a framework within which the Board may conduct its oversight of the business and affairs of the Company to serve as the ultimate decision-making body of ChargePoint."

44. The Governance Guidelines state, in relevant part:

**5. Overseeing Management Succession Planning.** The Nominating and Corporate Governance Committee, in consultation with the full Board, is primarily responsible for succession planning for the CEO and oversees management's succession plans for other key executives. Succession planning can be critical in the event the CEO should cease to serve for any reason, including resignation or unexpected disability, or if their service is temporarily disrupted. In addition, the Board believes that establishment of a strong management team is the best way to prepare for an unanticipated executive officer departure and will confer with the CEO to encourage management development programs.

**6. Formulating Company Strategy.** The Board is actively involved with management in formulating corporate strategy and annually reviews the Company's strategic plan as well as its annual operating plans, budgets and major corporate actions.

**7. Overseeing Risk Management, Legal and Ethical Compliance.** The Board, as a whole, and through its standing committees, has responsibility for the oversight of the Company's risk management, legal and ethical compliance by considering that processes are in place for maintaining the integrity of the Company.

\*\*\*

**9. Ensuring the Integrity of Financial Reporting.** The Audit Committee oversees the integrity of the Company's accounting and financial reporting systems, including overseeing the audit of the Company's annual financial statements by independent auditors, and assessing the Company's disclosure controls and procedures and systems of internal control.

45. The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Harris, Harris, Heystee, and Singh-Bushell during the Relevant Period.

The purpose of the Audit Committee is to assist the Board in the oversight of, among other things, "the integrity of the Company's accounting and financial reporting processes and the audit of the Company's financial statements," "the Company's compliance with legal and regulatory requirements," and "the performance of the Company's internal audit function and independent auditor and the assessment and management of the risks associated with [ChargePoint's] internal accounting and financial controls."

46.    Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include:

### 1. Review Responsibilities

• **Internal Controls.** Review and discuss with management and the independent auditor the design, implementation and maintenance of the Company's internal controls, including the adequacy and effectiveness, significant deficiencies or material weaknesses in those controls reported by the independent auditor or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls. Review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure.

• **Disclosure Controls and Procedures.** Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures. Review the attestations or reports by the independent auditors relating to disclosure controls and procedures.

*     *     *

• **Review Required Reports.** Review and discuss with management and the independent auditor the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Forms 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K. Direct the

independent auditors to review the annual and quarterly reports using professional standards and procedures for conducting such reviews. Conduct a post audit review of the financial statements and audit findings, including any suggestions for improvements provided to management by internal audit or the independent auditors, and management's response to such suggestions.

• **Review Financial Activities.** Review the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements. Review and oversee the Company's cash management, investing activities, and tax planning and compliance, and approve policies related to these matters, if any.

\*      \*      \*

• **Quarterly Earnings Review.** Review, in general, earnings press releases, and review and discuss with management and the independent auditors' policies with respect to earnings press releases and the type and presentation of information to be included therein (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts, and rating agencies.

\*      \*      \*

• **Review of Internal Audit.** Oversee internal audit department's structure, objectivity, responsibilities, staffing, resources and budget. Discuss with the independent auditor the independent auditor's judgment about the competence, performance and cooperation of internal audit and management and internal audit's responsibilities, budget and staffing.

47.    Under the heading "Legal and Regulatory Compliance," the Audit Charter provides that the Audit Committee has a duty to oversee ChargePoint's compliance. Specifically, the Audit Committee must "oversee matters relating to the Company's ongoing liquidity, including its internal and external sources of liquidity, and capital resources, including the Company's financing agreements."

48.    The Nominating and Governance Committee Charter (the "Governance Charter") imposes additional duties and responsibilities on the members of the

Governance Committee, which included Bowman, Chizen, and Leschly during the Relevant Period. Among the duties imposed by the Governance Charter are:

- Oversee the management of risks associated with director independence, conflicts of interest, board composition and organization, and director succession planning.

- Review periodically the succession planning for the CEO and other executive officers, report the findings and recommendations to the Board, and work with the Board in evaluating potential successors to these positions.

- Review actual and potential conflicts of interest, including potential taking of "corporate opportunities" by insiders, Board members, and corporate officers, other than related party transactions reviewed by the audit committee of the Board, and approve or prohibit any involvement of such persons in matters that may involve a conflict of interest or the taking of a corporate opportunity.

## SUBSTANTIVE ALLEGATIONS

*Background*

49.     ChargePoint is the result of a special purpose acquisition transaction between Legacy ChargePoint, Inc. ("Legacy ChargePoint") and Switchback Energy Acquisition Corp, which closed on February 26, 2021. On March 1, 2021, the Company began trading on the NYSE under the ticker "CHPT" and "CHPT.WS"

50.     ChargePoint provides networked solutions for charging electric vehicles, including the ChargePoint cloud subscription platform and charging hardware. ChargePoint claims its goods and services are designed for an array of charging scenarios from home to workplace, parking, hospitality, retail, and transport fleets of all types.

*The Individual Defendants Breach Their Duties To The Company
And Its Stockholders By Issuing False and Misleading Statements*

51.     Through a series of communications, the Individual Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.

52.     On December 7, 2021, the Company issued a press release announcing its third quarter 2022 financial results. The press release stated that "GAAP gross margin was 25%, up from 20% in the prior year's same quarter primarily as a result of product cost improvements and the impact of acquisitions" and that the Company was raising its fourth quarter and full year 2022 revenue guidance. In relevant part, the press release stated:

> "ChargePoint has delivered another strong quarter, as we have continued to scale our commercial, fleet and residential verticals across two continents," said Pasquale Romano, President and CEO of ChargePoint. "The investments we have made over many years have enabled us to capture charging demand from customers preparing for an electric future. This quarter we added more customers at an accelerated rate, while also successfully closing two acquisitions."

**Third Quarter Fiscal 2022 Financial Overview**

- **Revenue**. For the third quarter, revenue was $65.0 million, an increase of 79% from $36.4 million in the prior year's same quarter. Networked charging revenue for the third quarter was $47.5 million, an increase of 111% from $22.6 million and subscription revenue was $13.4 million, up 24% from $10.8 million in the prior year's same quarter. Revenue growth was significant in *North America* and *Europe* across ChargePoint's commercial, fleet and residential verticals.

- **Gross Margin.** Third quarter GAAP gross margin was 25%, up from 20% in the prior year's same quarter primarily as a result of product cost improvements and the impact of acquisitions. Third quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, was 27% compared to 20% in the prior year's same quarter.

- **Net Income/Loss**. Third quarter GAAP net loss was $69.4 million, which included a $2.4 million loss from the change in fair value of warrant liabilities and $16.0 million in stock-based compensation expense. Non-GAAP pre-tax net loss, which excludes stock-based compensation expense and other items, in the third quarter was

$47.3 million as compared to $32.5 million in the prior year's same quarter.

*   *   *

**Fourth Quarter and Full-year Guidance**

ChargePoint expects revenue of $73 - $78 million for its fourth quarter ending January 31, 2022, and is raising its full year revenue outlook to $235 - $240 million, from $225 - $235 million, for the fiscal year ending January 31, 2022.

53.     On March 2, 2022, ChargePoint issued a press release announcing its fourth quarter and full fiscal year 2022 financial results ended January 31, 2022. The press release stated that for the fourth quarter of 2022, "GAAP gross margin was 22%, up from 21% in the prior year's same quarter primarily due to the impact of acquisitions." The press release also revealed the Company's first quarter 2023 and full year 2023 revenue guidance. In relevant part, the press release stated:

> "ChargePoint delivered another outstanding quarter, exceeding the high end of both our quarterly and annual revenue guidance and advancing our technology leadership in our commercial, fleet and residential verticals across North America and Europe," said Pasquale Romano, President and CEO of ChargePoint. "We had numerous successes in our first year as a publicly traded company, including a 65 percent year over year increase in annual revenue, two strategic acquisitions, expansion of our activated port count by over 60 percent, and growing our team of world class talent."

**Fourth Quarter Fiscal 2022 Financial Overview**

- **Revenue**. For the fourth quarter, revenue was $80.7 million, an increase of 90% from $42.4 million in the prior year's same quarter. Networked charging systems revenue for the fourth quarter was $59.2 million, an increase of 109% from $28.3 million in the prior year's same quarter and subscription revenue was $17.2 million, up 57% from $11.0 million in the prior year's same quarter.

- **Gross Margin.** Fourth quarter GAAP gross margin was 22%, up from 21% in the prior year's same quarter primarily due to the impact of acquisitions. Fourth quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, was 24% compared to 22% in the prior year's same quarter primarily due to the impact of acquisitions.

- **Net Income/Loss**. Fourth quarter GAAP net loss was $60.5 million, which included a $16.9 million gain from the change in fair value of

warrant liabilities and $15.4 million in stock-based compensation expense. Non-GAAP pre-tax net loss in the fourth quarter, which excludes stock-based compensation expense and other items, was $58.5 million as compared to $33.6 million in the prior year's same quarter.

\*     \*     \*

**Fiscal 2023 Guidance**

For the first fiscal quarter ending April 30, 2022, ChargePoint expects revenue of $72 million to $77 million. At the midpoint, this represents an anticipated increase of 84% as compared to the prior year's same quarter.

For the full fiscal year ending January 31, 2023, ChargePoint expects:

- Revenue of $450 million to $500 million. At the midpoint, this represents an anticipated increase of 96% as compared to the prior year

- Non-GAAP gross margin of 22% to 26%

- Non-GAAP operating expenses of $350 million to $370 million. At the midpoint, this represents an anticipated increase of 50% as compared to the prior year.

54.     On May 31, 2022, the Company issued a press release announcing its first quarter 2023 financial results. Therein, ChargePoint stated that for its first quarter of 2023, the Company's "GAAP gross margin was 15%, down from 23% in the prior year's same quarter as newer, currently lower margin, products performed strongly relative to more mature, higher margin offerings, and due to supply chain disruptions, which affected both cost and supply availability." The Company attributed the lower gross margins to, among other things, "global supply constraints." Notwithstanding, the Company stood by its full-year 2023 revenue guidance. In relevant part, the press release stated:

> "Positive first quarter results, despite expected significant headwinds due to global supply constraints, are a testament to the strength of our business," said Pasquale Romano, president and CEO of ChargePoint. "Our investments in a comprehensive portfolio for all verticals we serve continue to set us apart when customers seek a charging solution."

**First Quarter Fiscal 2023 Financial Overview**

- **Revenue**. For the first quarter, revenue was $81.6 million, an increase of 102% from $40.5 million in the prior year's same quarter. Networked charging systems revenue for the first quarter was $59.6 million, an increase of 122% from $26.8 million in the prior year's same quarter and subscription revenue was $17.6 million, up 63% from $10.8 million in the prior year's same quarter.

- **Gross Margin.** First quarter GAAP gross margin was 15%, down from 23% in the prior year's same quarter as newer, currently lower margin, products performed strongly relative to more mature, higher margin offerings, and due to supply chain disruptions, which affected both cost and supply availability. First quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, was 17% compared to 23% in the prior year's same quarter due to the same factors.

- **Net Income/Loss**. First quarter GAAP net loss was $79.4 million, down from $89.3 million in the prior year's same quarter. Non-GAAP pre-tax net loss in the first quarter, which primarily excludes $24.0 million in stock-based compensation expense, $3.0 million amortization expense from acquired intangible assets and other items, was $52.8 million as compared to $71.7 million in the prior year's same quarter. Non-GAAP Adjusted EBITDA Loss, which primarily excludes stock-based compensation expense, depreciation expense and amortization expense of acquired intangible assets, was $48.9 million in the first quarter, as compared to $67.1 million in the prior year's same quarter.

\*     \*     \*

**Second Quarter and Full Year Guidance.**

For the second fiscal quarter ending July 31, 2022, ChargePoint expects revenue of $96 million to $106 million. At the midpoint, this represents an anticipated increase of 80% as compared to the prior year's same quarter.

For the full fiscal year ending January 31, 2023, ChargePoint continues to expect:

- Revenue of $450 million to $500 million. At the midpoint, this represents an anticipated increase of 96% as compared to the prior year

- Non-GAAP gross margin of 22% to 26%

- Non-GAAP operating expenses of $350 million to $370 million. At the midpoint, this represents an anticipated increase of 50% as compared to the prior year.

55.    On August 30, 2022, ChargePoint issued a press release announcing its second quarter 2023 financial results. Therein, the Company announced that its

---

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

"second quarter GAAP gross margin was 17%, down from 19% in the prior year's same quarter" and continued to attribute the lower gross margins "to supply chain disruptions, which affected both cost and supply availability as well as increasing new product introduction and transition costs." Notwithstanding, the Company remained confident in the expected full-year 2023 guidance. In relevant part, the press release stated:

> "ChargePoint delivered another strong quarter, with continued growth across all verticals and geographies," said Pasquale Romano, President and CEO of ChargePoint. "We continue to execute on our strategy, as demand continues to grow for our portfolio of industry-leading charging solutions for every vertical and in both North America and Europe."

> **Second Quarter Fiscal 2023 Financial Overview**

> - **Revenue**. For the second quarter, revenue was $108.3 million, up 93% from $56.1 million in the prior year's same quarter. Networked charging systems revenue for the second quarter was $84.1 million, up 106% from $40.9 million in the prior year's same quarter and subscription revenue was $20.2 million, up 68% from $12.1 million in the prior year's same quarter.

> - **Gross Margin.** Second quarter GAAP gross margin was 17%, down from 19% in the prior year's same quarter primarily due to supply chain disruptions, which affected both cost and supply availability as well as increasing new product introduction and transition costs. Second quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, improved sequentially to 19%, but was down from 23% in the prior year's same quarter due to the same factors.

> - **Net Income/Loss**. Second quarter GAAP net loss was $92.7 million, as compared to $84.9 million in the prior year's same quarter. Non-GAAP pre-tax net loss in the second quarter, which excludes $26.4 million in stock-based compensation expense, $3.0 million amortization expense from acquired intangible assets and other items, was $62.3 million as compared to $40.3 million in the prior year's same quarter.

> \* \* \*

> **Third Quarter and Full Year Guidance**

> For the third fiscal quarter ending October 31, 2022, ChargePoint expects revenue of $125 million to $135 million. At the midpoint, this represents an anticipated increase of 100% as compared to the prior year's same quarter.

For the full fiscal year ending January 31, 2023, ChargePoint continues to expect:

- Revenue of $450 million to $500 million. At the midpoint, this represents an anticipated increase of 96% as compared to the prior year

- Non-GAAP gross margin of 22% to 26%

- Non-GAAP operating expenses of $350 million to $370 million. At the midpoint, this represents an anticipated increase of 50% as compared to the prior year.

56.     On December 1, 2022, the Company issued a press release announcing its third quarter 2023 financial results, which ended October 31, 2022. The press release stated, in relevant part:

> "ChargePoint delivered another quarter of growth exceeding 90% year-over-year, as we continue to scale the business to meet strong demand for our solutions across North America and Europe," said Pasquale Romano, President and CEO of ChargePoint. "Our networked, asset-light business model continues to enable our growth as we strive to deliver improved margins and operating leverage."

> **Third Quarter Fiscal 2023 Financial Overview**

> - **Revenue**. Third quarter revenue was $125.3 million, up 93% from $65.0 million in the prior year's same quarter. Networked charging systems revenue for the third quarter was $97.6 million, up 105% from $47.5 million in the prior year's same quarter and subscription revenue was $21.7 million, up 62% from $13.4 million in the prior year's same quarter.

> - **Gross Margin.** Third quarter GAAP gross margin was 18%, down from 25% in the prior year's same quarter primarily due to supply chain disruptions, which affected both cost and supply availability, and increased new product introduction and transition costs. Third quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, improved sequentially to 20%, but was down from 27% in the prior year's same quarter due to the same factors.

> - **Net Income/Loss**. Third quarter GAAP net loss was $84.5 million, as compared to $69.4 million in the prior year's same quarter. Non-GAAP pre-tax net loss in the third quarter, which excludes $25.7 million in stock-based compensation expense, $2.8 million amortization expense from acquired intangible assets and other items, was $56.4 million as compared to $47.3 million in the prior year's same quarter.

* * *

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Fourth Quarter and Full Year Guidance**

For the fourth fiscal quarter ending January 31, 2023, ChargePoint expects:

- Revenue of $160 million to $170 million. At the midpoint, this represents an anticipated increase of 108% as compared to the prior year's same quarter

- A sequential Non-GAAP gross margin improvement from the third quarter's 20%, resulting in annual gross margin below previous guidance

For the full fiscal year ending January 31, 2023, ChargePoint expects:

- Revenue of $475 million to $485 million. At the midpoint, this represents an anticipated increase of $5 million as compared to previous guidance

- Non-GAAP operating expenses of $325 million to $335 million. At the midpoint, this represents an anticipated decrease of $30 million as compared to previous guidance.

57.   On March 2, 2023, the Company issued a press release announcing its fourth quarter and full year 2023 financial results. Therein, Defendant Romano is quoted as stating that the Company "delivered its largest sequential revenue growth to date and another record quarter, although below our guidance range as supply challenges for our DC solutions and quarter end shipment challenges at this growth rate persisted."

58.   In the press release, ChargePoint reported that the Company's "[f]ourth quarter GAAP gross margin improved sequentially to 22%, but was flat to the prior year's same quarter," "[f]ull year GAAP gross margin was 18%, down from 22% in the prior year," and that for its first quarter 2024, the Company expected revenues of between $123 and $132 million.

59.   In the press release, Defendant Romano stated that the Company "continued to extend our technology and market leadership position across North America and Europe this year while driving 94% year-over-year growth and

delivering improving gross margin and better operating expense leverage as we progress toward profitability."

60. The press release stated, in relevant part:

**Fourth Quarter Fiscal 2023 Financial Overview**

- **Revenue**. Fourth quarter revenue was $152.8 million, up 93% from $79.3 million in the prior year's same quarter. Networked charging systems revenue for the fourth quarter was $122.3 million, up 109% from $58.7 million in the prior year's same quarter and subscription revenue was $25.7 million, up 50% from $17.2 million in the prior year's same quarter.

- **Gross Margin.** Fourth quarter GAAP gross margin improved sequentially to 22%, but was flat to the prior year's same quarter. Fourth quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense, amortization from acquired intangible assets and non-recurring restructuring costs, improved sequentially to 23%, but was down from 24% in the prior year's same quarter.

- **Net Income/Loss**. Fourth quarter GAAP net loss was $78.0 million, as compared to $60.1 million in the prior year's same quarter primarily due to a $16.9 million fair value gain of the assumed common stock warrant liability in the prior year quarter and higher stock-based compensation expense in the current quarter. Non-GAAP pre-tax net loss in the fourth quarter, which primarily excludes $25.7 million in stock-based compensation expense, $3.0 million amortization expense from acquired intangible assets and other items, was $45.5 million as compared to $58.5 million in the prior year's same quarter.

\* \* \*

**Full Fiscal 2023 Financial Overview**

- **Revenue**. For the full year, revenue was $468.1 million, an increase of 94% from $241.0 million in the prior year. Networked charging systems revenue for the full year was $363.6 million, an increase of 109% from $173.9 million, and subscription revenue was $85.3 million, up 59% from $53.5 million in the prior year.

- **Gross Margin.** Full year GAAP gross margin was 18%, down from 22% in the prior year. Full year non-GAAP gross margin, which primarily excludes stock-based compensation expense, amortization from acquired intangible assets and nonrecurring restructuring costs, was 20%, down from 24% in the prior year.

\* \* \*

- **Net Income/Loss.** Full year GAAP net loss was $344.5 million as compared to $132.2 million in the prior year. Full year non-GAAP pre-tax net loss, which primarily excludes stock-based compensation expense, amortization expense and other items, was $235.8 million as compared to 185.5 million in the prior year.

**First Quarter of Fiscal 2024 Guidance**

For the first fiscal quarter ending April 30, 2023, ChargePoint expects revenue of $122 million to $132 million. At the midpoint, this represents an anticipated increase of 56% as compared to the prior year's same quarter.

61.     On June 1, 2023, ChargePoint issued a press release announcing its first quarter 2024 financial results for the period ended April 30, 2023. The press release stated that in the first quarter of 2024, ChargePoint's "GAAP gross margin was 23%, up from 15% in the prior year's same quarter." The press release stated, in relevant part:

"ChargePoint delivered strong results in the first quarter, growing at nearly 60% year-over-year. We focused on delivering our broad portfolio of charging solutions across North America and Europe, while continuing to improve gross margins, and managing operating expenses," said Pasquale Romano, President and CEO of ChargePoint. "The positive first quarter results are a testament to the strength and diversity of our business. As the only charging network to operate across all verticals in North America and Europe, we believe we remain well positioned to take advantage of the inevitable long-term growth opportunity ahead."

**First Quarter Fiscal 2024 Financial Overview**

- **Revenue**. First quarter revenue was $130.0 million, up 59% from $81.6 million in the prior year's same quarter. Networked charging systems revenue for the first quarter was $98.3 million, up 65% from $59.6 million in the prior year's same quarter. Subscription revenue was $26.4 million, up 49% from $17.6 million in the prior year's same quarter.

- **Gross Margin.** First quarter GAAP gross margin was 23%, up from 15% in the prior year's same quarter. First quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, was 25%, up from 17% in the prior year's same quarter.

- **Net Income/Loss**. First quarter GAAP net loss was $79.4 million, down from $89.3 million in the prior year's same quarter. Non-GAAP pre-tax net loss in the first quarter, which primarily excludes $24.0 million in stock-based compensation expense, $3.0 million

amortization expense from acquired intangible assets and other items, was $52.8 million as compared to $71.7 million in the prior year's same quarter. Non-GAAP Adjusted EBITDA Loss, which primarily excludes stock-based compensation expense, depreciation expense and amortization expense of acquired intangible assets, was $48.9 million in the first quarter, as compared to $67.1 million in the prior year's same quarter.

\* \* \*

**Second Quarter of Fiscal 2024 Guidance**

For the second fiscal quarter ending July 31, 2023, ChargePoint expects revenue of $148 million to $158 million. At the midpoint, this represents an anticipated increase of 41% over the prior year's same quarter.

62.     On August 8, 2023, the Company filed its first quarter 2024 report on Form 10-Q with the SEC, which stated, in relevant part:

Gross profit increased during the three months ended April 30, 2023 compared to the three months ended April 30, 2022 primarily due to an increase in Networked Charging Systems sales that resulted from an increase in the number of Networked Charging Systems delivered and an increase in Subscriptions revenue.

Gross margin increased during the three months ended April 30, 2023 compared to the three months ended April 30, 2022 primarily due to efficiencies realized in managing cost of Networked Charging Systems.

\*\*\*

Disruptions in the manufacturing, delivery and overall supply chain of vehicle manufacturers and suppliers have resulted in additional costs and, to a lesser extent, component shortages, and have led to fluctuations in EV sales in markets around the world. Increased demand for personal electronics and trade restrictions that affect raw materials have contributed to a shortfall of semiconductor chips, which has caused additional supply challenges both within and outside of ChargePoint's industry. Ongoing supply chain challenges, component shortages and heightened logistics costs have adversely affected ChargePoint's gross margins in recent quarters and ChargePoint expects that gross margins may continue to be adversely affected by increased material costs and freight and logistic expenses in the future.

63.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (1) the Company was experiencing higher component costs and supply overruns for

first-generation DC charging products; (2) as a result, the Company was likely to incur impairment charges; (3) as a result of the foregoing, the Company's profitability would be adversely impacted; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

***The Truth Begins To Emerge, And The Individual Defendants Double Down On Their False And Misleading Statements***

64.  The truth began to emerge on September 6, 2023, when ChargePoint issued a press release announcing its second quarter 2024 financial results. Therein, the Company revealed that it had taken a $28.0 million "inventory impairment charge to address a significant supply-chain related issue" but stated that ChargePoint "remain[ed] committed to delivering on [the] goal of generating positive non-GAAP adjusted EBIDA by the end of the calendar 2024."

65.  In the press release, the Company reported that ChargePoint's "[s]econd quarter GAAP gross margin was 1%, down from 17% in the prior year's same quarter, and non-GAAP gross margin was 3%, down from 19% in the prior year's same quarter, in both cases primarily due to a $28.0 million, or 19 percentage point, inventory impairment charge." The Company stated that the "inventory impairment charge was taken to address legacy supply chain-related costs and supply overruns on a particular DC product."

66.  With respect to the Company's net income/loss, the Company reported second quarter 2024 GAAP net losses of $125.3 million and non-GAAP pre-tax net losses of $86.1 million "both reflecting the $28.0 million inventory impairment charge" and [n]on-GAAP Adjusted EBITDA losses of $81.2 million which also purported to reflect the Company's second quarter 2024 inventory impairment charge.

67.  The press release stated, in relevant part:

"In the second quarter, ChargePoint delivered solid growth. Our revenue of $150 million represents a 39% year-over-year increase despite a hesitant economy," said Pasquale Romano, President and CEO of ChargePoint. "In the quarter we fortified our access to working capital with a $150 million revolving credit facility and $38 million raised via our "at-the-market" offering. We took an inventory impairment charge to address a significant supply-chain related issue, and we announced an estimated $30 million in annualized operating expense savings from reorganizing the business for agility, efficiency and scale. We remain committed to delivering on our goal of generating positive non-GAAP adjusted EBITDA by the end of calendar 2024."

**Second Quarter Fiscal 2024 Financial Overview**

- **Revenue**. Second quarter revenue was $150.5 million, up 39% from $108.3 million in the prior year's same quarter. Networked charging systems revenue for the second quarter was $114.6 million, up 36% from $84.1 million in the prior year's same quarter. Subscription revenue was $30.0 million, up 48% from $20.2 million in the prior year's same quarter.

- **Gross Margin**. Second quarter GAAP gross margin was 1%, down from 17% in the prior year's same quarter, and non-GAAP gross margin was 3%, down from 19% in the prior year's same quarter, in both cases primarily due to a $28.0 million, or 19 percentage point, inventory impairment charge. This inventory impairment charge was taken to address legacy supply chain-related costs and supply overruns on a particular DC product.

- **Net Income/Loss**. Second quarter GAAP net loss was $125.3 million, up from $92.7 million in the prior year's same quarter. Non-GAAP pre-tax net loss was $86.1 million as compared to $62.3 million in the prior year's same quarter, both reflecting the $28.0 million inventory impairment charge. Non-GAAP Adjusted EBITDA Loss was $81.2 million also reflects this inventory impairment charge in the second quarter, as compared to $56.2 million in the prior year's same quarter.

- **Liquidity**. As of July 31, 2023, cash on the balance sheet was $263.9 million, which includes $37.7 million of at-the-market share offering gross proceeds during the second quarter.

- **Shares Outstanding**. As of July 31, 2023, the Company had approximately 360 million shares of common stock outstanding.

68.    The press release included the Company's guidance for the remainder of the year:

**Third Quarter, Fourth Quarter and Full Fiscal Year 2024 Guidance**

For the third fiscal quarter ending October 31, 2023, ChargePoint expects:

- Revenue of $150 million to $165 million. At the midpoint, this represents an anticipated increase of 26% as compared to the prior year.

- Non-GAAP gross margin of 22 to 25%.

- Non-GAAP operating expenses of $81 million to $84 million.

For the fourth fiscal quarter ending January 31, 2024, ChargePoint expects non-GAAP operating expenses of $79 million to $82 million.

For the full fiscal year ending January 31, 2024, ChargePoint expects revenue of $605 million to $630 million. At the midpoint, this represents an anticipated increase of 32% as compared to the prior year.

69.     During the related earnings call, Defendant Jackson commented on the Company's expected guidance for its third quarter 2023, stating in relevant part:

> **Turning to guidance.** For the third quarter of fiscal 202[4], we expect revenue to be $150 million to $165 million, up 26% year-on-year and up 5% sequentially at the midpoint. For the full fiscal year, we are guiding to $605 million to $630 million, up 32% year-on-year at the midpoint.
>
> Regarding gross margin, for the third quarter, we expect to be between 22% and 25% on a non-GAAP basis as we work through the inventory levels discussed earlier. With the inventory issue behind us and aggressive programs for improving our cost structure on supply and manufacturing, we would expect to resume continued improvement in gross margin next year.

70.     On this news, the Company's share price dropped $0.77, or 11%, to close at $6.29 per share on September 7, 2023, on unusually heavy trading volume.

71.     On September 11, 2023, the Company filed its second quarter financial results on Form 10-Q with the SEC (the "2Q24 10-Q") quarterly report for the period ended July 31, 2023. The 2Q24 10-Q stated that "[f]or the remainder of fiscal year 2024, ChargePoint expects revenue to grow in both Networked Charging Systems and subscriptions due to increased demand in EVs and the related charging infrastructure market."

72.     The 2Q24 10-Q also discussed the Company's inventory and impairment charge:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Inventory levels are analyzed periodically and written down to their net realizable value if they have become obsolete, have a cost basis in excess of expected net realizable value or are in excess of expected demand. During the three months ended July 31, 2023, the Company recorded an impairment charge of $28.0 million, consisting of $15.0 million charge to write down the carrying value of certain inventory on hand, as well as $13.0 million charge for losses on noncancelable purchase commitments for inventory to be received after July 31, 2023, to reduce the carrying value of certain DC fast charging products to their estimated net realizable value. The inventory impairment charge is included in the cost of revenue - networked charging systems in the condensed consolidated statements of operations.

73.    The 2Q24 10-Q provided the following generic risk warnings in an attempt to warn investors of risks related to ChargePoint's inventory:

ChargePoint's revenue growth is directly tied to the number of passenger and commercial EVs sold, which it believes drives the demand for EV charging infrastructure. The market for EVs is still rapidly evolving and although demand for EVs has grown in recent years, there is no guarantee of such future demand.

* * *

ChargePoint depends on the timely supply of materials, services and related products to meet the demands of its customers, which depends in part on the timely delivery of materials and services from suppliers and contract manufacturers. Significant or sudden increases in demand for EV charging stations, as well as worldwide demand for the raw materials and services that ChargePoint requires to manufacture and sell EV charging stations, including component parts, may result in a shortage of such materials or may cause shipment delays due to transportation interruptions or capacity constraints. Such shortages or delays could adversely impact ChargePoint's suppliers' ability to meet ChargePoint's demand requirements.

74.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (1) higher component costs and supply overruns for first-generation DC charging products; (2) as a result, the Company was likely to incur additional impairment charges; (3) as a result of the foregoing, the Company's profitability would be adversely impacted; and (4) as a result, the Individual Defendants' positive statements

about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

***The Truth Is Fully Revealed***

75.   The truth was fully revealed on November 16, 2023. On that day, the Company issued a press release announcing that ChargePoint had appointed Defendant Wilmer as President and CEO of the Company effective November 16, 2023, and that the Company had removed Defendants Romano and Jackson from their positions as President/CEO and CFO, respectively. In relevant part, the press release stated as follows:

> [ChargePoint] has appointed Rick Wilmer as its new President and Chief Executive Officer, effective November 16, 2023. In conjunction with the appointment, Mr. Wilmer has joined the ChargePoint Board of Directors.
>
> Since joining ChargePoint as Chief Operating Officer in July 2022, Mr. Wilmer has been responsible for Product Management, Development, Engineering, Manufacturing and Supply Chain, as well as Customer Experience. Prior to ChargePoint, Mr. Wilmer's career spanned more than 30 years in global technology, operations and customer support. He brings business and financial acumen to ChargePoint from his prior leadership roles, including the position of CEO at Pliant Technology, Leyden Energy, Mojo Networks and Chowbotics.
>
> ***
>
> [Defendant] Wilmer succeeds [Defendant] Romano, who has served as ChargePoint's CEO since 2011 … ChargePoint also announced that [CFO Defendant] Jackson has departed the company, effective [November 16, 2023].

76.   Also, on November 16, 2023, the Company issued another press release after market hours providing certain preliminary third-quarter 2024 financial results. Therein, the Company revealed a second inventory impairment charge of $42 million and that ChargePoint's revenues were "far short of expectations." In relevant part, the press release stated as follows:

> Our core markets of North America and Europe both came under pressure late in the third quarter, with revenue falling far short of expectations. Overall macroeconomic conditions, along with fleet and commercial vehicle delivery delays impacted anticipated deployments

with government, auto dealership and workplace customers." said [Defendant] Wilmer, President and CEO of ChargePoint.

* * *

Over the past 18 months in his prior role as [Defendant] has completed a thorough analysis of ChargePoint's supply chain, manufacturing partnerships and inventory management approach. "The ChargePoint board and I are committed to significantly improving operational execution to ensure that the Company is building a stronger, more resilient business for the benefit of all stakeholders. Our first steps are to take an additional non-cash inventory impairment charge related to product transitions and to better align inventory with current demand. We remain committed to our goal of generating positive adjusted EBITDA in the fourth quarter of calendar 2024," said Wilmer.

**Preliminary Third Quarter Fiscal Year 2024 Financial Performance**

- Revenue of $108 to $113 million, as compared to $150 to $165 million as previously expected.

- ChargePoint expects to take a non-cash impairment charge of $42 million resulting in GAAP gross margin of negative 23% to negative 21% and non-GAAP gross margin of negative 19% to negative 17%.

- Pre-impairment non-GAAP gross margin of 19% to 21%, as compared to 22% to 25% as previously expected.

- ChargePoint expects GAAP operating expenses of $129 million to $131 million. Non-GAAP operating expenses of $80 million to $82 million, as compared to $81 million to $84 million as previously expected.

- As of October 31, 2023, cash, cash equivalents and restricted cash was approximately $397 million, which includes $232 million of at-the-market share offering gross proceeds, as previously announced on October 11, 2023.

- As of October 31, 2023, ChargePoint's $150 million revolving credit facility remains undrawn, and the Company has no drawn debt maturities until 2028.

77.     On this news, the Company's share price dropped $1.11, or 35%, to close at $2.02 per share on November 17, 2023, on unusually heavy trading volume.

## THE INSIDER TRADING DEFENDANTS SELL
## COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

78.     During the period of wrongdoing described above, the Insider Trading Defendants sold Company stock while it was trading at artificially inflated prices due

to the false and misleading statements alleged herein and while they were in possession of material non-public information:

- Between December 17, 2021 and November 16, 2023, Defendant Chizen sold 115,700 shares for total proceeds of about $1.8 million.

- Between December 17, 2021 and November 16, 2023, Defendant Jackson sold 670,269 shares for total proceeds of over $4.6 million.

- Between December 17, 2021 and November 16, 2023, Defendant Linse sold 13,064,522 shares for total proceeds of almost $123 million.

- Between December 17, 2021 and November 16, 2023, Defendant Romano sold 1,275,802 shares for total proceeds of almost $15.3 million.

- Between December 17, 2021 and November 16, 2023, Defendant Singh-Bushell sold 4,622 shares for total proceeds of over $25,000.

- Between December 17, 2021 and November 16, 2023, Defendant Wilmer sold 33,490 shares for total proceeds of over $250,300.

79. While many of the Company's stockholders lost significant money with the share price dropping substantially when the truth was revealed, many of the Insider Trading Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by ChargePoint's public stockholders.

80. As a result, the Insider Trading Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of ChargePoint stock and stock options they held.

1

## **INVESTORS FILE SECURITIES CLASS ACTIONS**

2      81.    On November 29, 2023, a purported purchaser of ChargePoint common

3   stock filed a securities class action complaint captioned *Khan v. ChargePoint*

4   *Holdings, Inc. et al.*, No. 5:23-cv-06172-PCP in the United States District Court for

5   the Northern District of California against ChargePoint and Defendants Romano and

6   Jackson (the "*Khan* Complaint"). The *Kahn* Complaint alleges that throughout the

7   class period of June 1, 2023 and November 16, 2023, defendants made materially false

8   and/or misleading statements, failing to disclose material adverse facts about the

9   Company's business, operations, and prospects related to impairment charges and

10  profitability.

11     82.    On January 22, 2024, a purported purchaser of ChargePoint common

12  Company stock filed a securities class action complaint, captioned *Smith v.*

13  *ChargePoint Holdings, Inc. et al.*, No. 3:24-cv-00363 in the United States District

14  Court for the Northern District of California against ChargePoint and Defendants

15  Romano and Jackson (the "*Smith* Complaint" together with the *Khan* Complaint, the

16  "Securities Class Actions"). The *Smith* Complaint alleges that throughout the class

17  period of December 7, 2021 and November 16, 2023, defendants made materially

18  false and/or misleading statements, failing to disclose material adverse facts about the

19  Company's business, operations, and prospects related to impairment charges and

20  profitability.

21     83.    On January 29, 2024, additional purported purchasers of ChargePoint

22  common stock moved this Court for consolidation of the Securities Class Actions and

23  appointment of lead plaintiff.  Oral argument on the motions was heard on March 14,

24  2024. The Court took the matters under submission and has not ruled on the motions.

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO CHARGEPOINT**

84.    As a result of the Individual Defendants' improprieties, ChargePoint disseminated improper public statements concerning its operations, prospects, and internal controls. This misconduct has devastated ChargePoint's credibility.

85.    As a direct and proximate result of the Individual Defendants' actions, ChargePoint has expended and will continue to expend significant sums of money defending and paying any settlement in the Securities Class Actions.

86.    As a direct and proximate result of the Individual Defendants' actions as alleged above, ChargePoint's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

87.    In addition, the actions of the Individual Defendants have irreparably damaged ChargePoint's corporate image and goodwill. For at least the foreseeable future, ChargePoint will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that ChargePoint's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

88.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

89.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and

unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

90.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

91.   Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

92.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and ChargePoint and was at all times acting within the course and scope of such agency.

**PLAINTIFF HAS BEEN A STOCKHOLDER SINCE THE ALLEGED WRONGDOING AND WILL FAIRLY AND ADEQUATELY REPRESENT THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS**

93.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

94.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

95.    Plaintiff is an owner of ChargePoint common stock and has been an owner of ChargePoint common stock since the wrongdoing alleged herein.

96.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

**DEMAND IS FUTILE BECAUSE EACH DIRECTOR DEFENDANT FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY**

97.    At the time Plaintiff commenced this action, the Board consisted of the eleven Director Defendants Bowman, Chao, Chizen, Harries, Harris, Heystee, Leschly, Linse, Singh-Bushell, Wagoner, and Wilmer. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

98.    The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning ChargePoint's business, operations, prospects, internal controls, and financial statements.

99.    Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they

knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

100.   The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

101.   If the Director Defendants were to bring a suit on behalf of ChargePoint to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. For this reason, Plaintiff's making a demand would be futile.

*The Audit Committee Defendants Face*
*A Greater Likelihood Of Personal Liability*

102.   The Audit Committee Defendants (Defendants Harris, Heystee, and Singh-Bushell), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the

Audit Committee Charter. For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

***The Compensation Committee Defendants***
***Face A Greater Likelihood Of Personal Liability***

103.   The Compensation Committee Defendants (Defendants Chizen, Leschly, and Lisen), as members of the Compensation Committee during the Relevant Period, knowingly disregarded their duties to oversee and, as appropriate, determine the annual salaries and other compensation of the Company's executive officers, and assisting and recommending to the Board appropriate compensation policies and practices and by approving performance bonuses to the executive compensation. Instead, the Compensation Committee Defendants approved unwarranted bonuses and compensation to the Company's executives by disregarding executives' lack of performance. Therefore, the Compensation Committee Defendants face a substantial likelihood of personal liability and cannot exercise disinterested business judgment in considering a demand to initiate and prosecute this action.

***The Insider Trading Defendants On The Board***
***Face A Greater Likelihood Of Personal Liability***

104.   Because of their positions as officers and/or board members, each of the Insider Trading Defendants (Defendants Chizen, Linse, Singh-Bushell, and Wilmer) possessed material non-public information that (1) ChargePoint was experiencing higher component costs and supply overruns for first-generation DC charging products; (2) as a result, the Company was likely to incur additional impairment charges; (3) and as a result of the foregoing, ChargePoint's profitability would be adversely impacted.

105.   The Insider Trading Defendants unlawfully misused this information and unjustly enriched themselves by selling their shares at artificially inflated prices. As a result, the Insider Trading Defendants' conduct harmed ChargePoint as the Insider

1    Trading Defendants unjustly enriched themselves at the Company's expense.

2    Accordingly, because this action asserts claims for unjust enrichment against the

3    Insider Trading Defendants, and because the Insider Trading Defendants face a

4    substantial likelihood of liability for these claims as well as for their breaches of

5    fiduciary duty to the Company, the Insider Trading Defendants are incapable of

6    considering a demand to commence and vigorously prosecute this action.

7    ***Certain Director Defendants Lack Independence***

8        106.  Defendant Wilmer is not an independent director. Wilmer is not

9    independent because his principal occupation is CEO and President of ChargePoint.

10   Previous to this role, Defendant Wilmer served as the Company's COO. Defendant

11   Wilmer has derived substantial income from the Company as a result of his positions

12   as COO and CEO. For the Company's fiscal year 2023, Defendant Wilmer received

13   almost $8.8 million in compensation. This amount is material to him. In addition,

14   Wilmer engaged in lucrative insider selling during the Relevant Period. Accordingly,

15   Demand is futile as to Defendant Wilmer.

16       107.  Defendant Bowman has served as a Company director since 2021, and

17   previously served as a director of Legacy ChargePoint since 2019; Defendant Chizen

18   has served as a Company director since 2021, and previously served as a director of

19   Legacy ChargePoint since 2014; Defendant Harries has served as a Company director

20   since 2021, and previously served as a director of Legacy ChargePoint since 2016;

21   Defendant Harris has served as a Company director since 2021, and previously served

22   as a director of Legacy ChargePoint since 2018; Defendant Leschly has served as a

23   Company director since 2021, and previously served as a director of Legacy

24   ChargePoint since 2009; Defendant Linse has served as a Company director since

25   2021, and previously served as a director of Legacy ChargePoint since 2012; and

26   Defendant Wagoner has served as a Company director since 2021, and previously

27   served as a director of Legacy ChargePoint from 2017. Accordingly, Defendants

28

Bowman, Chizen, Harries, Harris, Leschly, Linse, and Wagoner were in charge of orchestrating the public offering of the Company, continue to serve as members of the Board, and, thus, face an even greater likelihood of liability in considering a demand.

108.   Additionally, Defendants Bowman, Chizen, Harries, Harris, Leschly, Linse, and Wagoner are incapable of considering a demand to commence and vigorously prosecute this action because they have longstanding business and personal relationships and cannot exercise independent business judgment in considering a demand to investigate and prosecute this action.

## FIRST CAUSE OF ACTION
### Against the Individual Defendants for Breach of Fiduciary Duties

109.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

110.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ChargePoint's business and affairs.

111.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

112.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ChargePoint.

113.   In breach of their fiduciary duties owed and owe to ChargePoint, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that (1) the Company was experiencing higher component costs and supply overruns for first-generation DC charging products; (2) as a result,

the Company was likely to incur impairment charges; (3) as a result of the foregoing, the Company's profitability would be adversely impacted; and (4) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

114.   Accordingly, ChargePoint's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

115.   The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

116.   The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

117.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

118.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or

acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

119.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

120.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ChargePoint has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Against the Securities Class Action Defendants**
**for Contribution under Sections 10(b), 20(a) and 21D of the Exchange Act**

121.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

122.   ChargePoint, along with the Securities Class Actions Defendants (Jackson and Romano), are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. If the Company is found liable in the Securities Class Actions, the Company's liability will be in whole or in part due to the Securities Class Actions Defendants' willful and/or reckless violations of their obligations as officers and/or directors of ChargePoint.

123.   Because of their positions of control and authority as officers and/or directors of ChargePoint, the Securities Class Actions Defendants were able to and

did, directly and/or indirectly, exercise control over the business and corporate affairs of ChargePoint, including the wrongful acts complained of herein and in the Securities Class Actions.

124.   Accordingly, the Securities Class Actions Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

125.   As such, ChargePoint is entitled to receive all appropriate contribution or indemnification from the Securities Class Actions Defendants.

### THIRD CAUSE OF ACTION
### Against the Individual Defendants for Unjust Enrichment

126.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ChargePoint.

127.   The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from ChargePoint that was tied to the performance or artificially inflated valuation of ChargePoint, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

128.   Plaintiff, as a stockholder and representative of ChargePoint, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the

Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

129.   Plaintiff, on behalf of ChargePoint, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**Against the Individual Defendants for Waste of Corporate Assets**

130.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Actions), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

132.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

133.   Plaintiff, on behalf of ChargePoint, has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**Against the Individual Defendants for Aiding and Abetting**

134.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

135.   Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to ChargePoint and has participated in a conspiracy in breach of fiduciary duties.

136.   In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful

conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

137.   The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

138.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

139.   Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

140.   Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

**SIXTH CAUSE OF ACTION**
**Against the Insider Trading Defendants for**
**Insider Selling and Misappropriation of Information**

141.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

142.  At the time of their stock sales set forth herein, the Insider Trading Defendants (Chizen, Jackson, Linse, Romano, Singh-Bushell, and Wilmer) knew of the information described above and sold ChargePoint common stock on the basis of such information.

143.  The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold ChargePoint common stock.

144.  The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

145.  Because the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of ChargePoint and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Ordering the Insider Trading Defendants to disgorge monies obtained as

1    a result of their sale of ChargePoint stock while in possession of insider information

2    as described herein;

3        D.      Awarding prejudgment interest to the Company;

4        E.      Granting appropriate equitable relief to remedy the Individual

5    Defendants' breaches of fiduciary duties and other violations of law;

6        F.      Awarding to Plaintiff the costs and disbursements of the action, including

7    reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

8        G.      Granting such other and further relief as the Court deems just and proper.

9                        **JURY TRIAL DEMANDED**

10       Plaintiff hereby demands a trial by jury.

11

12   Dated:  May 2, 2024                    Respectfully submitted,

13                                          **BRAGAR EAGEL & SQUIRE, P.C.**

14                                          */s/ Melissa A. Fortunato*
15                                          Melissa A. Fortunato (SBN 319767)
                                              fortunato@bespc.com
16                                          Marion C. Passmore (SBN 228474)
                                              passmore@bespc.com
17                                          580 California Street, Suite 1200,
                                            San Francisco, CA 94104
18                                          Telephone: (415) 568-2124
                                            Facsimile: (212) 214-0506
19

20

21

22

23

24

25

26

27

28
                                          47
                        VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Reony Tonneyck, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further verify that I am a current holder, and have been a holder, of ChargePoint Holdings, Inc. common stock since the time of Defendant's wrongdoing alleged in the complaint.  I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___1___ day of May 2024.

Reony Tonneyck (May 1, 2024 09:27 EDT)

Reony Tonneyck

**VERIFICATION**

I, Robert Hann, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further verify that I am a current holder, and have been a holder, of ChargePoint Holdings, Inc. common stock since the time of Defendant's wrongdoing alleged in the complaint.  I declare under penalty of perjury that the foregoing is true and correct.


Executed this ___1st___ day of May 2024.

_____

Robert Hann

**VERIFICATION**

I, Ronald Hinton, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further verify that I am a current holder, and have been a holder, of ChargePoint Holdings, Inc. common stock since the time of Defendant's wrongdoing alleged in the complaint.  I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of May, 2024.

Ronald Hinton (May 1, 2024 19:07 EDT)

Ronald Hinton